## Sproson *v.* Philadelphia & Reading Railway Company, Appellant.

*Railroads—Nuisance—Negligent use of yards—Damage to residential property—Evidence.*

A recovery may be had against a railroad company for injuries done to residential properties from smoke, gases, dust and cinders thrown upon the properties, in the operation of cleaning, coaling and stoking locomotives in the company's yard contiguous to the residences, where an expert witness for the owners testifies without contradiction, that it was perfectly practicable to avoid the trouble by the erection of a shelter shed, ventilating flues and electric fans; and this is the case, although the witness is not able to testify that such devices were used by any other railroad company in yards situated in residential districts.

Argued Dec. 11, 1912. Appeals, Nos. 198, 199, 200 and 201, from judgments of C. P. No. 2, Phila. Co., June T., 1911, Nos. 2,540, 2,541, 2,542 and 2,543, on verdicts for plaintiffs in cases of Mary Sproson, Blanche

G. Mentzenheimer, Louis Grotz and Frederika Bern-
hard v. Philadelphia & Reading Railway Company.
Before RICE, P. J., HENDERSON, MORRISON, ORLADY,
HEAD and PORTER, JJ.   Affirmed.

Trespass to recover damages for injuries to residential
properties.   Before SULZBERGER, P. J.

The facts are stated in the opinion of the Superior
Court.

Verdicts and judgments in each case for plaintiffs for
$100.   Defendant appealed.

*Errors assigned* in each case were in refusing binding
instructions for defendant.

*Wm. Clarke Mason*, for appellant.—There was no
proof that the operation of the yard was negligent and
that more smoke, gases, dust and ashes were created
than necessarily incident to such an operation, and
that the methods adopted by the defendant in cleaning,
watering and coaling its engines were not similar to
those in use by other railroads: Romer v. Ry. Co., 75
Minn. 211; Bennett v. R. R. Co., 181 N. Y. 431;
Parrott v. R. R. Co., 10 Ohio St. 624; Randle v. Pacific
R. R. Co., 65 Mo. 325; Dunsmore v. Ry. Co., 72 Iowa,
182; Baltimore & Potomac R. R. Co. v. Fifth Baptist
Church, 108 U. S. 317; Cleveland & Pitts. R. R. Co. v.
Speer, 56 Pa. 325; Struthers v. Ry. Co., 87 Pa. 282;
Penna. R. R. Co. v. Lippincott, 116 Pa. 472; Penna.
R. R. Co. v. Marchant, 119 Pa. 541; Jones v. R. R. Co.,
151 Pa. 30; Del. River Iron Ship Building v. Nuttall,
119 Pa. 149; Titus v. R. R. Co., 136 Pa. 618; Canavan
v. Oil City, 183 Pa. 611; Kilbride v. Carbon, etc., Co.,
201 Pa. 552.

The defendant contends, that the evidence of the
witness concerning the value of the construction and
operation advised by him is of little worth because of
his statement that his proposed remedy is contrary to

the standard adopted by other railroads in similar situations: Pennsylvania R. R. Co.'s Case, 213 Pa. 373; Mahoning & Shenango Ry. & Lt. Co., 233 Pa. 413; Boyd v. Harris, 176 Pa. 484.

*William A. Carr*, with him *W. Horace Hepburn* and *Sidney L. Krauss*, for appellees.—The company was guilty of negligence: Stokes v. Penna. R. R. Co., 214 Pa. 415; Baltimore & Potomac R. R. Co. v. Fifth Baptist Church, 108 U. S. 317; Cogswell v. N. Y., etc., R. R. Co., 103 N. Y. 10; Garvey v. Long Island R. R. Co., 159 N. Y. 323; Spring v. Delaware, etc., R. R. Co., 88 Hun (N. Y.), 385; Terminal Company v. Jacobs, 109 Tenn. 727; Pennsylvania R. R. Co. v. Angel, 41 N. J. Eq. 316 (7 Atl. Repr. 432); Kuhn v. Illinois Central R. R. Co., 111 Ill. App. 323; Tucker v. Vicksburg S. & P. Ry. Co., 51 So. Repr. 689.

OPINION BY RICE, P. J., July 16, 1913:

These four cases were tried together. They were actions of trespass to recover damages for injuries to the plaintiffs' properties alleged to have been caused by the defendant's negligent, careless, and unlawful use of its railroad yard in their immediate vicinity. The plaintiffs' properties were occupied as residences, and, before the alleged acts, were, according to the testimony, free from the inconveniences to which they have since been subjected by the defendant's use of its yard. They front on N. Eighth st. in the city of Philadelphia, and abut in the rear on N. Darien st., a street twenty feet wide running from Wallace st. to Fairmount ave. It is alleged that after the defendant company acquired the property adjoining N. Darien st., from Wallace st. to Fairmount ave., it established thereon a railroad yard; that it erected in the bed of Wallace st., which it seems was closed as a public street, a large coal elevator and chute for the purpose of supplying its locomotives with coal; that it laid on the property, within a few feet of N. Darien st., a large

number of railroad tracks or switches running to and through the elevator or chute; that it also erected on the property three water towers used for watering locomotives; that it also used these tracks for the storage of its locomotives. We now quote from one of the statements: "That the said locomotives of the defendant company are run upon the tracks constructed as aforesaid, where they take coal and water, and are cleaned and stoked, and are in such close proximity to plaintiff's properties that they cause large quantities of smoke, cinders, dust, water and gas to pass from their said property in and upon the properties of the plaintiff." A few excerpts from the testimony are sufficient to give a general idea of the nature, extent, and continuity of the injuries of which the plaintiffs complain.

The husband of one of them testified: "We complained of the dirt and the cinders and the kind of soot that goes into the building into our homes and spoils the property. It eats off the paint and eats off the roof and goes into your furniture and carpets, and the gases coming from these engines standing back there, and your washing is ruined by this stuff, and your home is covered, and you get saturated from water that these engines all throw out."

Being asked as to the kind of substance that came from defendant's property, he said: "Cinders is one. Cinders, of which we have a sample here; they go all over the property. They form crusts on the roof and they blow on to your window sills and get into the paint. It will eat through the paint, and there is some acid formation and it eats away the tin. It will eat anything that it lies on, in time."

Being asked as to the effect on the plaintiffs' yards within the time covered by the actions, he testified: "It will cover the yards with these cinders and things, and spoil every living plant, or anything like that—your plants that you may have in your yard. It will just kill them right off. You can't have anything there. It covers the yards and crust forms."

Again he testified: "The soot and the dirt, the cinders and the gases, from this nuisance we complain of, made that so we couldn't open the windows because it literally, as I stated, covered the floors and put your curtains and carpets and the varnish on the furniture in such a condition that you had to keep them closed all the time."

As to the conditions before and after, he testified as follows: "Q. Prior to the 1st of January, 1911, what was the condition of the properties as to these things that you mention?   A. We always kept the properties in good condition.   We weren't complaining of the nuisance because we weren't bothered with it.   Q. Did you have any of these conditions that you speak about?   A. No, sir; we didn't.   Q. And you didn't begin to have until they began to place their engines in that yard there?   A. Yes. Q. And how many engines are brought in the rear of your properties at one time?   How many have you seen at one time?   A. I have seen twenty and over and under. Q. And what was being done with them?   A. Being taken care of as an engine should, I suppose; fires, stokes and flues cleaned out, and everything like that, to get them ready again for the next trip.   Q. And how close are those engines to your property?   A. Well, they run them up to the first track, which is within ten yards from the wall. By the Court: Q. What wall?   A. From our home."

A witness who examined the Sproson property and the defendant's property testified: "Well, in going over the roof, measuring the roof, I saw that the yard where the engines were standing, I think there was something like— I counted sixteen engines and no protection at all.   The smoke was so intense and the cinders and soot that I had to go away from the roof; couldn't stay there."

Another plaintiff testified as to the condition before and after: "We had none of the smoke nor the gases.   We were perfectly satisfied with our home.   We had a beautiful yard, in which we raised parsley and lettuce and had shrubbery.   Now we can't raise anything.   You go out in the yard and you get drenched with water and smoke.

It almost stifles you. . . . Last year we had to move because we couldn't stand the smoke, gas and soot."

The following extracts from the testimony of Harry W. Sproson, the husband of one of the plaintiffs, are also pertinent: "Q. What kind of a property did you have on the first day of January, 1911?   A. A very beautiful home, very much destroyed by the smoke and gases and cinders that came blowing from the railroad.   Q. What kind of a yard did you have?   A. Always had a very nice yard; grassplot in it, in the summer, also flowers.   Now I have nothing in the yard, nothing but the bare ground.   You cannot grow anything.   Q. Could you grow it last summer, the grass?   A. No, could not grow anything last summer, it was impossible.   The ground was covered with half an inch of ashes. . . . You can go out there in the yard and sweep it up, the yard itself, and if the wind blows from the west, the southwest or the northwest, in ten hours' time you can sweep it up again."

Being asked on cross-examination as to what was done to the engines, he testified: "They bring them in there and draw the fires; that drops into the box under the engine. Then they take them to the coal chute and drop them into a pit.   After they are in this pit they turn a hose, probably three inches of water, right on the hot cinders.   Naturally, that will raise a dust to begin with.   While they are stoking those engines there, drawing the fire, they put on a blower, in order to get up steam with, and they blow all that stuff into the air."

It was admitted on the trial that the defendant's railroad yard in the rear of the plaintiffs' houses, "on which the operation complained of is conducted by the defendant company is open; that there is no covering over the tracks by way of a building with a roof or sides."

We need not quote further from the statement of claim or the testimony in order to show the nature and extent of the injuries of which the plaintiffs complain.   It is sufficient for present purposes to say that there was much other testimony of the same kind, and that the above-

quoted allegations of the statement, as well as the further allegation that the plaintiffs' properties were substantially damaged and were depreciated in rental value by the acts complained of, were abundantly supported by the uncontradicted testimony introduced by the plaintiffs. The defendant introduced no testimony, but rested its defense on the proposition that the plaintiffs could not recover without proof of negligence, and that they had, introduced no evidence which entitled them to have the question of negligence submitted to the jury. Its position is thus stated by its learned counsel: "It is not denied that some damage has been caused to the property of the plaintiffs by reason of the smoke, gases, dust and ashes which at certain times are blown upon it by the west wind from the defendant's railroad yard, but it is contended for the defendant that there is no evidence that the yard was constructed in a negligent manner or that its operation by the defendant is not up to the standard of care required under the circumstances." The issue was further simplified by the following colloquy which took place between court and counsel on the trial: "The Court: Is it seriously denied that the inconveniences do occur? Mr. Mason: Not at all, sir. The Court: Then the whole issue is reduced to one of avoidable or unavoidable nuisance. Mr. Mason: Avoidable nuisance. The Court: That is the whole issue. Mr. Mason: That is the whole issue." We do not understand the court or counsel to mean by these remarks, that the question was whether it was reasonably practicable for the defendant to locate its yard in another place and thus avoid substantial injury to the plaintiffs and others; nor do we understand that defendant's counsel intended to concede that that question was open to investigation and adjudication on the trial of these cases. The immediate context shows that counsel insisted, and the court declared, that the location was a matter resting in the absolute discretion of the defendant, and that the exercise thereof was not reviewable by the court or jury. The Pennsylvania cases cited by the de-

fendant's counsel go far to sustain this contention. Moreover, in its rulings upon evidence, as well as in its charge to the jury, the court tried the case upon the theory that the question of the propriety of the location of the yard was not involved. We shall consider the case in the same view.

Assuming then that the defendant had the absolute right to locate its yard in a residential part of the city, and there to store, clean, stoke, coal, and water its locomotives, the question for decision is, whether there was evidence from which a jury could legitimately find that there was a reasonably practicable method which the defendant could have adopted for avoiding the injuries to the plaintiff's property resulting from such use of its yards, and that it was negligent in not adopting that or some similar method for that purpose.

J. M. Withan, a witness called by the plaintiffs, testified that he was a graduate of the engineering department of the United States Naval Academy, had followed engineering for thirty-five years, and had been a consulting engineer for twenty-five years; that he had made a specialty of the study of combustion, the use of fuel, and the ventilation, heating, and power of plants; and that he had had experience in providing methods of doing away with the evils of gases, smoke, cinders and dust. He testified in some detail as to the nature of the operations in which he had had experience, and as to the conditions he found upon examination of the plaintiffs' and defendant's premises. After further preliminary questioning as to his qualifications as an expert, he was asked to state whether as an engineer he knew of any method that could be adopted by the defendant to prevent the throwing upon the properties of the plaintiffs of the cinders, ashes, gases, and smoke, caused by the operation in its railroad yard. After having replied in the affirmative, he was asked to state what remedy could be adopted. Whereupon the defendant objected. The court then said: "That is objectionable unless it is limited to something

reasonably practicable according to reasonable demonstrations, fortified by reasonable experience. Otherwise you would only be inviting attention to theories. Mr. Withan will understand the limitations." The witness replied that he did, and then proceeded to describe the remedy that could be adopted. We have referred thus in detail to these preliminaries for the purpose of showing that the witness was qualified by experience, as well as by study, to give expert testimony upon the very subject involved in these cases, and that what he testified to was not a mere theory, but was a practicable remedy justified by experience and use under substantially similar conditions. This remedy was to erect a shelter shed, with roof and sides, over the section spoken of, which in area is about 108 feet wide by 240 feet long; to place in this building a certain number of ventilating flues, chimneys, or stacks 150 feet high, and extending above the peak of the building seventy-five feet; and, in order to increase the draft at the base of each of these stacks and up in the peak of the roof, to put a fan driven by an electric motor, which, according to the testimony of the witness, would draw the gases, dust, and smoke up into a higher zone in the atmosphere, where they would be so widely dispersed by the ordinary air currents that the noxious matter that would eventually gravitate to the earth in any one place would be so small as to do no substantial injury to anyone. This is but an outline of the remedy suggested by the witness. His testimony as to its practicability was tested by thorough and extended cross-examination, and, in our judgment, was not seriously shaken. Nor did he testify to anything which can be declared to be contrary to well-known natural laws. Moreover, the defendant introduced no testimony whatever tending in any way to impeach that of the witness. It is clear from this résumé, that the court would not have been warranted in giving binding direction in favor of the defendant upon the ground that there was no testimony which would warrant the jury in finding that it was reasonably practicable for the defendant

to avoid the injuries to the plaintiffs' property without shifting those injuries to other properties and without impairing the efficiency of the use of its yard for the purpose stated.

This brings us to the serious question in the cases. The court asked the witness this question: "Have you any knowledge of any railroad company's yard, a yard like this, in proximity to a residential neighborhood, and, if so, have you any knowledge of any device other than an open yard, like this, used by a railroad company?" In reply, the witness answered as to his knowledge of other railroad yards in proximity to residential districts, and then said: "I have not seen any railroad that went to the trouble or did erect a shelter and ventilating flues in the manner I have described, or in any other way than these open yards—those that I have seen." He further testified, upon cross-examination by defendant's counsel, that he had never seen a similar area, occupied by railroad tracks, covered by such a structure, except at terminal stations, where, as it is well known, it is not unusual to see such a structure, closed on the sides and at one end and open at the other end. It is seen from this testimony, taken as a whole, that the structure suggested by the witness as part of the practicable remedy is not an unusual thing even in the operation of a railroad, but that such structure, with ventilating flues, over a railroad yard such as this, is unusual. It is argued that the defendant cannot be held liable to the plaintiffs in the absence of evidence that other railroad companies operating similar yards have adopted the method of construction and operation contended for by the plaintiffs. We think we do not misapprehend the argument of the counsel when we say that it would logically result therefrom that, until railroad companies generally, or, at least, some railroad companies, adopt some method of avoiding injury to adjacent properties consequent upon their location of open railroad yards in residential districts, and the use of such yards for storing, cleaning, stoking, coaling and watering their locomotives,

no one railroad company is under any obligation which can be recognized in a court of law to do anything to protect adjacent properties against injury from the noxious matter which is cast upon them as the result of such operation of its yard. We cannot assent to a view which would logically lead to the conclusion that, because no railroad company has done anything to prevent such injurious results, every railroad company may omit to do anything to that end without being liable in damages for the injury consequent upon its omission. Accepting to the fullest extent the doctrine as stated by Justice Williams in Boyd v. Harris, 176 Pa. 484, as to the discretion of a railroad company in locating its railroad and necessary works, and conceding the absolute right of the company to locate such yard in a residential district, it is equally clear that, if it exercise that right, it is still not exempt from the duty to use care according to the circumstances, so that substantial and unnecessary damage to other property owners may be avoided. Thus, in the leading case of Penna. R. R. Co. v. Lippincott, 116 Pa. 472, it was said: "If this Pennsylvania Company has been guilty of a nuisance; if in the use of its road it makes more smoke or dust than is lawfully allowable in the working of its machinery, and the plaintiffs are thereby injured they have their remedy, but not for anything short of this." Doubtless there are many inconveniences which unavoidably result to others from the location and operation of such yard in the vicinity of residences, and for these the law gives no remedy by action. "When parties are engaged in a lawful business, in order to sustain an action for injury resulting therefrom, the injury must be shown to have been real and substantial, not a trifling annoyance or injury such as is necessarily incident to the business complained of:" Harvey v. Susquehanna Coal Co., 201 Pa. 63. But we cannot agree that the sole test by which to determine the question whether the real and substantial injuries shown to have been caused to the plaintiffs, were the necessary incidents of a lawful conduct

of the defendant's business, is the practice of other railroad companies. The practical question in these cases was to the feasibility of controlling the gases, smoke and dust thrown off in the cleaning, coaling and stoking of the defendant's locomotives, so that the noxious matter would not be cast on the plaintiffs' properties to their substantial injury. As abundantly shown by the testimony, a practical question similar in all its essential features has arisen in the conduct of a variety of industrial and manufacturing establishments, and has been met successfully by the application of the method suggested here. We see no reason to doubt the competency of this testimony; and, if competent, upon what ground can it be said that the jury could not properly take it into consideration in determining whether the defendant exercised care according to the circumstances? In answer to this question we are referred to a number of cases, arising between employer and employee, in which it has been held that an employer is not bound to supply his employee with appliances not in general use, and when he furnishes them such tools and appliances as with ordinary and reasonable care may be used without danger, he has discharged his duty and is not responsible for accidents resulting. In some of these cases it has been said that the test is "general use," and in others that it is "general use in the particular business." But these cases rest on a principle which is not involved in a case where no contract relation existed between the parties, and where the party aggrieved could do nothing to protect himself against the injury complained of, but which turns on the obligation of one owner of property conducting a lawful business thereon to so conduct it as not to inflict substantial injury upon his neighbor which it has been demonstrated, by actual experience under the same or substantially similar conditions, it is reasonably practicable' to avoid. In such a case, involving the conduct of a private business, it would constitute no defense that all others conducting the same kind of business have done

nothing to avoid inflicting such injury, and we are firmly convinced that the rule is not different where the business involved is the operation of a railroad yard in a residential district for the purpose of cleaning, coaling, stoking and watering locomotives. The just principles which we think required the submission of the cases to the jury are so clearly and forcibly stated in the charge of the learned trial judge that we are constrained to conclude this discussion with the following extended quotation therefrom: "My ruling is that if the thing had been done in a sufficient number of industries to make it evident that it is practicable from the point of view of art, namely, that the state of the art is such that you can get rid of these nuisances, and that other industries find it economically possible to do it, and the evidence is uncontradicted that great industries find it so, then railroad companies have no exclusive right to refuse to recognize the practice of other industries, they have no right to say that they are different in such a station, from any other plant where similar conditions exist, and that if they are different it must produce evidence to show how they are different and why they are different. That evidence they have failed to produce. It therefore falls back to the one thing: do you believe Mr. Withan? That is for you. If you are satisfied that, by the laws of nature and the discoveries of of science and art, the abatement of this nuisance is entirely practicable, and if you are satisfied from an economic point of view large and important manufactories do practically in many instances make use of this method, that it is used so often as to show that it is, not only scientifically practicable, but also economically and financially practicable, then you are at liberty to find that the defendant is guilty of maintaining a nuisance; and if you do come to that conclusion, the parties, who are only endeavoring to ascertain the right of the thing here, have substantially agreed that you shall give a verdict for the plaintiffs for $100, in each case. If, however, you conclude that there is no practicable method, and by "practicable"

I do not mean that it is only theoretically possible, but that it is also financially and economically possible, if you find there is none such, then your verdict must be for the defendant."

The judgment is affirmed.